UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20 CR 137 SNLJ (ACL) |
| | ) | |
| JAWON D. JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

## FIRST AMENDED REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).  Pending before the undersigned is Defendant Jawon D. Johnson's Motion to Suppress Evidence (Doc.24) and statements that were obtained following an interaction with law enforcement on July 25, 2020.

Johnson argues that he did not commit a traffic violation thereby making the subsequent discovery of a gun and marijuana that were in his possession unlawful.  He also asks for the suppression of any statements he made.

The Government opposes the Motion arguing that Patrolman Anthony Vezeau had a particularized and objective basis for contacting Johnson as he believed a traffic law had been violated.  The Government also argues that Ptlm. Vezeau's initial interaction with Johnson did not constitute a seizure.

Patrolman Vezeau, and Johnson testified at the evidentiary hearing.  The parties submitted memoranda and supplements after the hearing.  (Docs. 35, 36, 37, 39, 44-1.)

In consideration of the pleadings, as well as the incident report and body camera video regarding the July 25, 2020 interaction, the undersigned recommends that the following findings of fact and conclusions of law be adopted, and that the Defendant's Motion to Suppress be denied.

## I.  Findings of Fact

Johnson is charged with being a previously convicted felon in possession of a firearm.  (Doc. 2.)  He claims that the discovery of the firearm and any other evidence that was gathered on the day in question was unlawful.

On Saturday, July 25, 2020, at 1:13 a.m., Cape Girardeau Police Department Patrolman Anthony Vezeau was on routine patrol in Zone One, a high-crime area.  While driving north on Sprigg Street, he saw a black Lincoln stopped in the middle of a side street, Merriwether.  Specifically, Ptlm. Vezeau noticed that the vehicle was parked in a manner that caused both lanes of travel on Merriwether Street to be obstructed.  Based on that observation, Ptlm. Vezeau turned around at the next intersection so he could determine why the vehicle was parked in violation of City Ordinance 26-259, which prohibits drivers from stopping, standing, or parking a vehicle in various locations.

By the time Ptlm. Vezeau was able to turn around at the next intersection and return to Merriwether Street, the driver of the Lincoln had pulled the vehicle to the side of the road.   Before parking behind the Lincoln, Ptlm. Vezeau turned his emergency lights on.  Once parked, Vezeau exited his patrol car and walked toward the Lincoln to communicate with the driver, Defendant Jawon D. Johnson.  As Ptlm. Vezeau approached the Lincoln, without any direction from the officer, Johnson rolled the

driver's side window down.  There was a male passenger in the front seat and a female

passenger in the backseat although Vezeau did not realize the female was in the vehicle

until later.  *See* Doc. 38, Transcript of Evidentiary Hearing, at p. 19, hereinafter (Tr. at

___.)

As Ptlm. Vezeau approached the vehicle, he was met with an overwhelming odor

of marijuana.  He engaged the driver in conversation, as follows:

| | |
|---|---|
| Ptlm.: | Hey man, how's it going? |
| Johnson: | Pretty good, man.  What about you? |
| Ptlm.: | Alright.  Hey, the reason I'm making contact with you, man, is you were stopped in the middle of the road. |
| Johnson: | Actually, sir, I was trying to drop her off.  I was letting her out right there.  I didn't, I didn't [*indecipherable*] so I was just [*indecipherable*] |
| Ptlm.: | Oh, okay. Yeah, you were just kinda in the road man and not over by the curb. |
| Johnson: | I'm sorry, sir. |
| Ptlm.: | How much weed you got in the car? |
| Johnson: | Uh, actually, sir, I was just finishing up a blunt.  Well, finishing it up [*indecipherable*], while I was dropping her off and threw it out.  Just had a blunt and we were smoking. |
| Ptlm.: | You ain't got anymore. |
| Johnson: | No, sir. |
| Ptlm.: | Alright.  You got your ID on you? |

| Johnson: | Uh, I have my old one.  I don't have my new one, but I do have a current, uh, I do have a current…license. |
|---|---|
| Ptlm: | Okay. |

(Gov't. Ex. #1 at 0:12 to 0:57.)

Throughout the entire interaction, the officers and citizens behaved courteously and respectfully toward each other.  During Johnson's suppression hearing testimony, Johnson agreed that Ptlm. Vezeau "was being polite and respectful with" him.  (Tr. 39.)

Based on Johnson's testimony during the hearing (Tr. 31-42), the undersigned was concerned he may have perjured himself.  In particular, referring to the Government's responsive brief (Doc. 29 at p. 2), Johnson testified that he did not say "I was going to let her out right *there*," rather insisted that he said "I was letting my passenger out *here*." (Tr. 35-36; Emphasis added.)  The undersigned provided the parties with an opportunity to review drafts (Doc. 44-1 at p. 4-5) of a transcription of the audio from the body camera.  The Defendant responded through an Affidavit (Doc. 44-1) in which he stated that he cannot hear parts of the audio so he is not certain what he said except that he was "not agreeing…that he was stopped in the middle of the road," *id*. at ¶ 8, rather he "was trying to drop off [his] passenger," *id*. at ¶ 9.  He added that he "was looking for a location to let" the passenger out.  *Id*. at ¶11.  He explained that because of the no parking sign at the corner of Merriwether, he "pulled forward to the curb where it was legal to park and [he] stopped [his] vehicle at that location."  *Id*. at ¶12.  He further denied that he ever stopped his car in the middle of the road, adding, his "vehicle never completely

came to a standstill in the middle of Merriwether St." *Id*. at ¶13.  More specifically, Johnson claimed, "I slackened my speed after making the right turn onto Merriwether St. to the point it came to rest at the curb, which is the position my vehicle was in as shown in the bodycam video." *Id*. at ¶15.  He further stated that "[a]ny perceived inaccuracies in my testimony were due to my faulty memory or honest mistake because I was surprised, confused, and scared when Patrolman Vezeau made initial contact with me" and due to the time that has passed since then.  *Id*. at ¶17.  The Government did not comment about the transcript prepared by the Court.  The undersigned finds that the transcription above is a true and accurate reflection of what can be heard on the body camera recording.

While at the driver's side window, Ptlm. Vezeau also asked for the male passenger's identifiers and then returned to his patrol car to check the two occupants on his Mobile Data Terminal.   By then Assistant Chief Barker arrived and he asked, "What do you got?"  Vezeau replied "They were stopped in the middle of the road. They had been smoking weed.  They said they smoked it all."  (Gov't. Ex. #1 at at 1:56-2:02.)

The officers returned to the Lincoln to ensure there was no additional marijuana in the vehicle.  Ptlm. Vezeau dealt with Johnson while Assistant Chief Barker managed the two passengers.  A pat down search of Johnson resulted in the discovery of a Glock 17 handgun and a bag of marijuana.

The Cape City Ordinance prohibiting drivers from obstructing a roadway includes an exception that allows a driver to park a vehicle to "momentarily pick up or discharge passengers."  *See* Sec. 26-246(a)(2).  The ordinance applies whether there are other vehicles travelling on the street, or not.

During the suppression hearing, Ptlm. Vezeau explained why he decided to check on the driver of the vehicle he observed on Merriwether Street:

> So my whole intention is – you know, on patrol in high crime areas, it's odd to be stopped in the middle of the road in the early morning hours, you know, with bars closed, impaired driving, and everything like that.  So, you know, I was just going to see if they had a reason for being stopped in the middle of the road and, you know, tell them like, *hey, make sure you pull over to the curb because it is a violation of city ordinance to be in the middle of the road.*  That's 26-259, parking in a way that would obstruct traffic.  So I got out.  I was just going to tell them – you know, make sure they're not impaired, anything like that, tell them, you know, make sure to pull over to the curb and not stop in the middle of the road.  When I approached the vehicle, I was met with the overwhelming smell of marijuana, and that's when the stop went from a simple traffic, like, hey, stay out of the road, to a further investigation.

(Tr. 9-10.)

After Johnson was taken to the police station, he was given the *Miranda* warning.  During the interview, Johnson admitted that he acquired the handgun for protection.

Johnson requests suppression of the evidence seized from him, as well as the statements he made following the traffic stop.

## II.  Conclusions of Law

Johnson argues that he "did not commit a traffic violation and that [he] was legally parked when Vezeau made the traffic stop."  (Doc. 35 at p. 11.)  He further argues that "it isn't unlawful for a driver to stop in the middle of Merriwether St[reet] to let out a passenger within walking distance of residential housing when there is no traffic on the road," nor is it unlawful "for a driver to legally park on Merriwether St[reet] to let out a passenger."  *Id.*

The undersigned concludes that Ptlm. Vezeau observed what he believed to be a traffic violation. As a result, his efforts to communicate with the driver of the vehicle about the violation were lawful. Before Ptlm. Vezeau made it to the window of the vehicle, he encountered evidence of a second law violation, possession of marijuana. The evidence that was seized should not be suppressed.

## II.A.  Interaction with motorist was lawful.

The Eighth Circuit has repeatedly held that "*any* traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001) (emphasis in original). *See also United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc); *United States v. Mallari*, 334 F.3d 765 (8th Cir. 2003).

"To determine whether a traffic stop was based on probable cause or was merely pretextual, an 'objective reasonableness' standard is applied." *Jones*, 275 F.3d at 680. An officer is justified in stopping a motorist when the officer "objectively has a reasonable basis for believing that the driver has breached a traffic law." *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996). *See United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999) (officer's mistaken belief, but objectively reasonable basis for believing, that a traffic violation occurred supported traffic stop). Moreover, subjective intent is not determinative in deciding whether the stop was reasonable. *See Whren v. United States*, 517 U.S. 806, 813 (1996).

Ordinance 26-246 for Cape Girardeau, Missouri (Defendant's Exhibit C) lists more than twenty different ways a person might unlawfully stop, stand or park a vehicle within the city.  Relevant excerpts from the Ordinance appear below:

Except when necessary to avoid conflict with other traffic, or in compliance with law or the directions of a police officer or official traffic-control device, no person shall:

(1) Stop, stand or park a vehicle:
***
    i.    At any place where official signs prohibit stopping.
***
    l.    Within six (6) feet of a driveway entrance located on any street or any portion of a divided street which has a paved surface of twenty (20) feet or less in width.
***
    m.    Within twenty (20) feet of any intersection of two (2) or more streets.
***

(2) Stand or park a vehicle, whether occupied or not, except momentarily to pick up or discharge passengers:
***
    a.  In front of a public or private driveway.
***
    f.  Within thirty (30) feet of the approach to a stop sign.
***
    g.  At any place where official signs prohibit parking.
***

*See* Defendant's Exhibit C, Cape Girardeau, Missouri, Code of Ordinances, Sec. 26-246. Ordinance 26-259, entitled "Obstruction of traffic," directs that "Parking, starting, stopping, standing and the manner of operating a vehicle, shall be performed in such manner as to permit a clear, free and unimpeded freeway, travelway or throughway on all

roadways and alleys within the city."   Yet another City Ordinance, Sec. 26-250(a) addresses parking on streets and provides "Except as otherwise provided in this chapter, every vehicle stopped or parked upon a roadway or street where there are adjacent curbs shall be so stopped or parked with the right-hand wheels of such vehicle parallel to and within eighteen (18) inches of the right-hand curb…"

Johnson attempts to cast doubt on Ptlm. Vezeau's observation of a traffic violation by arguing that Vezeau did not have enough time to conclude that Johnson's vehicle was stopped in the middle of the roadway as the officer travelled north on Sprigg Street. Johnson also emphasizes the fact that he was legally parked by the curb when the officer approached his vehicle.  Johnson further claims the location was not a high-crime area as it was near a church and the old police station, as well as within two blocks of this courthouse.  Most significantly, Johnson denies that he ever stopped his car in the middle of Merriwether on the night in question.

Upon approaching Johnson's vehicle, Ptlm. Vezeau immediately explained that he had observed the car parked in the middle of the roadway and that it needed to be parked by the curb.  Johnson apologized for being in the middle of the roadway and explained that he was planning to drop off a passenger, a woman who was in fact still in the vehicle. Ptlm. Vezeau clearly articulated what he wanted to talk to Johnson about; and he provided the same explanation to a senior officer who responded to the scene ("They were stopped in the middle of the road." *See* Gov't. Ex. #1 at 1:56).  During his testimony, Ptlm. Vezeau recited the applicable Ordinance as Section "26-259, parking in a way that would obstruct traffic" and not being parked by the curb.  (Tr. 9)  His narrative

report described the violation as a vehicle "stopped in the middle of the roadway."  *See* Defendant's Exhibit A.  During his testimony, Ptlm. Vezeau described the traffic violation as "parking in a way that would obstruct traffic."  (Tr. 9.)  Both his comments on the night in question about why he believed the driver of the Lincoln had committed a traffic violation, as well as his written report and testimony support potential violations of multiple ordinances, including Sections 26-246, 26-250(a), and 26-259.

This Court accepts the testimony of Ptlm. Vezeau as true.  He did not dress up his observations by indicating any other traffic violation had occurred.  Nor did the officer suggest that Johnson had committed any crime other than obstructing a roadway.  The Court finds that Ptlm. Vezeau's decision to pull behind Johnson's stopped vehicle after observing it parked in the middle of the roadway after 1:00 a.m. on the weekend in a high-crime area was objectively reasonable in the circumstances.  Even if Ptlm. Vezeau was mistaken, the reasonableness of his actions is determined by what the officer reasonably knew at the time.  *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005).  His testimony was that he was concerned about why the vehicle was parked in the middle of the roadway and wanted to be sure the driver was not impaired.  In consideration of all the circumstances, Ptlm. Vezeau's decision to contact Johnson in his vehicle after the car had been pulled to the roadside was reasonable.

It is worth clarifying that the interaction in question was not a typical traffic stop as the record shows Johnson was stopped *before* Ptlm. Vezeau turned onto Merriwether Street to investigate.  As noted by the Government, the Eighth Circuit recently questioned whether an officer's act of pulling behind a parked vehicle followed by activation of

emergency lights, and an approach to a vehicle on foot equates to a seizure.  *United States v. Halter*, 988 F.3d 1042, 1046 (8th Cir. 2021).  Much like the Eighth Circuit's conclusion in *Halter*, it is not necessary to reach that issue, because even if Johnson was seized, the seizure was justified for another reason.  Here, it was objectively reasonable for Ptlm. Vezeau to believe that Johnson had breached a traffic law.

Finally, the case law Johnson relies upon (Doc. 35 at p. 12-14[1]) does not involve scenarios where officers were investigating perceived traffic stops.  Even if the record showed that Johnson did not actually commit a traffic violation, Ptlm. Vezeau reasonably believed that Johnson was obstructing a city street, a violation of local ordinances.  Under the law of the Eighth Circuit, Vezeau's efforts to address the perceived traffic violation were proper.

---

[1] *See United States v. Dawdy*, 46 F.3d 1427, 1430 (8th Cir. 1995) (presence of two men parked in a pharmacy parking lot after 10 p.m. would not be sufficient to provide reasonable suspicion criminal activity was afoot, but officers had additional information justifying stop of vehicle); *United States v. Packer*, 15  F.3d 654, 659 (8th Cir. 1994) (anonymous tip regarding four African-American men parked in what was described as a "suspicious" vehicle without any elaboration of why it was suspicious "lacked the minimum detail of information that would point to any arguably particularized suspicion of criminal conduct"); *United States v. Jefferson*, 906 F.2d 346, 348 n. 3 (8th Cir. 1990) (trooper did not have reasonable suspicion of criminal activity based solely on a rental car with out-of-state plates being parked at a rest area at 6:40 a.m.); *United States v. Thompson*, 712 F.2d 1356, 1361 (11th Cir. 1983) (observation of furtive gesture by person in a car that had been parked for abnormally long time and knowledge occupant did not own vehicle, did not give officer reasonable suspicion of criminal activity where officer indicated he did not suspect criminal activity until person complied with his request to hand over a vial that contained a white powdery substance); *United States v. Beck*, 602 F.2d 726, 729 (5th Cir. 1979) (officer's decision to question two African-American men in car that was parked in high crime area with the engine running and fact officer did not recognize the men "provided no basis for believing that criminal activity was afoot"); *Thompson v. Reuting*, 968 F.2d 756, 759 (8th Cir. 1990) (confirmation of the presence of a particularly described "suspicious" car that was parked in a reported location did not establish an objectively reasonable basis to suspect the occupants were involved in criminal activity).

The Court finds Ptlm. Vezeau's interaction with Johnson, a stopped motorist whom the officer reasonably believed had committed a traffic violation, was according to law and constitutional.

## II.B.   Probable Cause to Arrest

Johnson's Motion further alleges there was no "probable cause or reasonable suspicion for the traffic stop."  (Doc. 35 at p. 14.)   The Court has already found it was reasonable for Ptlm. Vezeau to suspect that a traffic violation had occurred.

The Supreme Court has recognized that the odor of an illegal drug can be highly probative in establishing probable cause for a search.  *United States v. Caves*, 890 F.2d 87, 90 (8th Cir. 1989), citing *Johnson v. United States*, 333 U.S. 10, 13 (1948) (observing that the odor of an illegal substance testified to by a qualified affiant "might very well be found to be evidence of a most persuasive character").  Many lower courts have relied primarily on the odor of marijuana in determining that probable cause existed for a warrantless automobile search.  *See, e.g., United States v. Reed*, 882 F.2d 147, 149 (5th Cir. 1989) (border patrol had probable cause after he detected burnt marijuana through a rolled-down window and driver appeared nervous); *United States v. Loucks*, 806 F.2d 208 (10th Cir. 1986) (probable cause existed after automobile was stopped for speeding, driver was "reeking" of marijuana as he sat in patrol car, and officer smelled what he thought was still-burning marijuana in the detained vehicle); *United States v. Haley*, 669 F.2d 201 (4th Cir. 1982) (patrolman had probable cause after he stopped speeding automobile, smelled intense odor of marijuana emanating from driver's body while he sat

in police cruiser, and also smelled strong marijuana odor when passenger rolled down window of the stopped vehicle).

This Court finds that the strong odor of marijuana that was detected by Ptlm. Vezeau as he approached the vehicle, along with Johnson's statement that he'd just finished smoking marijuana, provided Vezeau with probable cause to believe that the vehicle contained the controlled substance justifying a search of the vehicle. *See United States v. Fladten*, 230 F.3d 1083, 1085-86 (8th Cir. 2000) (per curiam) (applying automobile exception to challenged warrantless search and seizure); *United States v. Caves*, 890 F.2d 87, 89-90 (8th Cir. 1989) (same).  It also established probable cause for Johnson's arrest, which necessitated a pat-down search of his person. *See United States v. Haynes*, 958 F.3d 709, 715 (8th Cir. 2020) ("once probable cause for an arrest exists, an officer may conduct a pat-down search incident to arrest") (citations omitted).  A loaded firearm and bag of marijuana were recovered from Johnson's groin area.  This Court credits Vezeau's testimony that he smelled the odor of marijuana from outside of Johnson's car.

The Court finds the search of Johnson's person and the Lincoln was according to law and not a violation of his constitutional rights.  As a result, the undersigned recommends that the request for suppression of the gun and marijuana be denied.

## II.C.  Statements

Finally, Johnson made a general request for the suppression of his statements during his interaction with Ptlm. Vezeau.  The Defendant made incriminating statements

related to the items seized from him at the scene.  He made additional admissions at the

police station after receiving the *Miranda* warning.

Insofar as the Defendant made statements during his interaction with Ptlm. Vezeau

on Merriwether Street, those statements should not be suppressed.  The Supreme Court

has compared routine traffic stops to *Terry* stops.

> [T]he usual traffic stop is more analogous to a so-called "*Terry* stop,". . .,
> than to a formal arrest."  Under the Fourth Amendment, we have held a
> policeman who lacks probable cause but whose "observations lead him to
> reasonably suspect" that a particular person has committed, is committing,
> or is about to commit a crime, may detain that person briefly in order to
> "investigate the circumstances that provoke suspicion."  *United States v.
> Brignoni-Ponce*, 422 U.S. 873, 881. . ."  [T]he stop and inquiry must be
> 'reasonably related in scope to the justification for their initiation.'"  *Ibid*.
> (quoting *Terry v. Ohio*. . .Typically, this means that the officer may ask
> the detainee a moderate number of questions to determine his identity and
> to try to obtain information confirming or dispelling the officer's suspicions.
> But the detainee is not obliged to respond.  And, unless the detainee's answers
> provide the officer with probable cause to arrest him, he must then be released.
> The comparatively nonthreatening character of detentions of this sort explains
> the absence of any suggestion in our opinions that *Terry* stops are subject to the
> dictates of *Miranda*.  The similarly noncoercive aspect of ordinary traffic stops
> prompts us to hold that persons temporarily detained pursuant to such stops are
> not "in custody" for the purposes of *Miranda*.

*Berkemer v. McCarty*, 468 U.S. 420, 439-440 (1984) (citations omitted).  *See United*

*States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003), quoting *United States v.*

*McGauley*, 786 F.2d 888, 890 (8th Cir. 1986) ("No *Miranda* warning is necessary for

persons detained for a *Terry* stop.").

While Ptlm. Vezeau approached Johnson to talk to him about a simple traffic

violation, that initial intrusion developed into something more akin to a *Terry* stop based

on the odor of marijuana.   Under the circumstances of this case it was reasonable for Vezeau to conclude that Johnson might be in possession of marijuana even without his voluntary statement that he'd been smoking marijuana.  Those circumstances justified the frisk of Johnson, as well as the routine questions asked by Ptlm. Vezeau.  *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *see also Michigan v. Long*, 463 U.S. 1032, 1048 (1983).

Additionally, "[v]erbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search."  *United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002), citing *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).  "[T]he defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence."  *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007).

In this case, it was reasonable for Ptlm. Vezeau to investigate a perceived traffic violation and that interaction resulted in Johnson's lawful arrest for possession of marijuana.  None of Johnson's statements constitute fruit of the poisonous tree.  *See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013).  Johnson did not argue that his statements were involuntary or that there was a violation of *Miranda v. Arizona*, 384 U.S. 436, 448-450 (1966), so those issues are not considered.

Johnson's request for suppression of his statements should be denied.

### III.  Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Evidence (Doc. 24) should be **denied**.

Further, the parties are advised that they have fourteen days, not later than June 1, 2021, in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained.  Failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).


_____
   ABBIE CRITES-LEONI
    UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of May, 2021.